## Miller *versus* Hanover Junction and Susquehanna Railroad Company.

1. A subscription to joint stock is not only an undertaking with the company but with all other subscribers, and a subscriber cannot be permitted to set up a secret parol arrangement with the agents of the company by which he may be released from his subscription whilst his fellow subscribers continue to be bound.

2. M. subscribed for stock for the "building and equipping of the extension of the H. J. & S. Railroad, according to the survey made by the P. & R. Railroad Company." The contract of subscription further stipulated that the money thus subscribed should be paid only when the subscriptions reached the sum of $100,000. That amount was subscribed, and M. refusing to pay his subscription, suit was brought therefor when he offered to prove that he was induced to subscribe by reason of certain representations made to him by officers of the company who declared that the road should be built, not as stated in the subscription book, but along defendant's house and upon the east side of the river, and that he would not be obliged to pay until the road was built. *Held,* that the court properly refused to admit this evidence.

May 7th 1878. Before Agnew, C. J., Mercur, Gordon, Paxson, Woodward and Trunkey, JJ. Sharswood, J., absent.

Error to the Court of Common Pleas of *Lancaster county:* Of May Term 1878, No. 80.

Assumpsit by the Hanover Junction and Susquehanna Railroad Company against John Miller, to recover the amount of a subscription for stock. The company plaintiff was incorporated by Act of Assembly approved May 28th 1872, Pamph. L. 602. Miller subscribed for five shares of stock in a book which contained a form of subscription, which, after reciting the date of the Act of Assembly, &c., continued :—

"And whereas, said act fixes the capital stock at $250,000, ten per centum of which must be subscribed, and one dollar per share paid thereon, before said company can receive its letters patent and a legal existence; and whereas, it is the desire of the undersigned subscribers to carry out in good faith and at the earliest possible moment all the provisions of said act, therefore, we, the undersigned subscribers, do promise, agree, bind and obligate ourselves and our heirs, severally, to and with the board of commissioners named in said act, or to any board or board of directors of said company, to pay them or their agents, duly authorized to receive the same, for the use of said company for each and every share of stock sub-

scribed by us as found herein affixed to our names severally the
sum of $50 lawful money of the United States, at such times and
in such manner as the board of commissioners or directors of said
company may, agreeable to the terms of said act, and the general
railroad laws of the aforesaid Commonwealth, designate.

"And it is further agreed, that we, the citizens of Marietta and
vicinity, do subscribe the amount opposite our respective names, on
the following conditions, viz :—

" That the amount hereby subscribed shall be devoted to the
building and equipping of the extension of the Hanover Junction
and Susquehanna Railroad, according to the survey made by the
Philadelphia and Reading Railroad Company, the same having
been adopted at the last meeting of the Hanover Junction and
Susquehanna Railroad Company, and it is further agreed that
there shall be a first-class station erected in Marietta by said com-
pany.

" Further, the said subscription shall only be paid when the sum
of $100,000 shall have been subscribed for this purpose, by the citi-
zens residing at or near the line of said above extension in Lancas-
ter county."

The $100,000 were subscribed, Miller being the forty-second on
the list of subscribers.    Calls on the stock subscribed were made,
and all but a few subscribers paid, among whom was Miller, against
whom this action was brought.    At the trial before Patterson, A.
L. J., to defeat a recovery on his subscription, Miller made the
following offer of evidence :—

That the subscription book of the plaintiff was brought to de-
fendant at his residence north of Marietta, on the east side of the
Susquehanna river, by the three persons named before (S. C. Hei-
stand, J. S. Given, J. A. Wolfersberger); it was represented to wit-
ness by Samuel C. Heistand that this road would be built past his
(witness') place, and up the east side of the Susquehanna river and
cross the river above witness' place, and if it did not do so he
needn't pay ; that that was understood between them to be a condi-
tion of this subscription, and that he needn't pay until it was so built ;
that these statements, representations and agreements, so made by
said Heistand, induced the witness (defendant), to subscribe for five
shares of stock; that the company have built no road either through
Marietta or above it, past defendant's place, but have partly graded
their road to a point below Marietta, near Chickies, and have partly
graded their road on the west bank of the Susquehanna river from
a point below Marietta to a point north of defendant's place of
residence.

The court refused to admit this evidence, and the defendant hav-
ing nothing further to offer, directed a verdict for plaintiff.    Ver-
dict accordingly, when defendant took this writ, and assigned for
error the action of the court.

[Miller *v.* Hanover Junc. & Sus. Railroad Co.]

*H. M. North* and *E. D. North*, for plaintiff in error.—The court below seemed to be of the opinion that the written subscription signed by the defendant was the only evidence that could be received to show the terms, conditions and stipulations of the contract between him and the plaintiff; in this we think there was manifest error. The testimony offered was to establish a condition precedent unperformed by the plaintiff, and that the subscription is not due and payable, and was plainly admissible under the rule that parol evidence is admissible to show that at the execution of a written contract, a stipulation has been entered into, a condition annexed, or a promise made by word of mouth upon the faith of which the writing has been executed, although such evidence vary and materially change the terms of the written contract: Kostenbader *v.* Peters, 30 P. F. Smith 438; Lippincott *v.* Whitman, 2 Norris 244; Greenawalt *v.* Kaster, 5 Id 45.

*George Nauman* and *W. B. Given*, for defendant in error.— We submit that the true rule is that a written contract can be varied only by showing a representation of a fact or a collateral promise which induced the making of it, and without which the contract would not have been made, or else a representation of the meaning of particular words, but all this, however, only where there is the authority to make the statements or promises, or where the situation of the parties is such that the authority to make the statements or promises may be presumed. The case of Greenawalt *v.* Myers & Kohne, *supra*, does not go father than this.

Representations as to an agreement to bind the corporation must be within the scope of the authority confided to the agent: Custer *v.* Titusville Gas and Water Co., 13 P. F. Smith 381. The payment of this sum of money was a condition precedent, to be performed by the subscribers before any work was done, because without money the road could not be built: Miller *v.* Railroad Co., 4 Wright 237.; Railroad Co. *v.* Biggar, 10 Casey 459; Boom Co. *v.* Dubois, 8 P. F. Smith 185. A subscription to a joint stock is not only an undertaking to the company, but with all other subscribers. Such contracts are trilateral, and even if fraudulent as between two of the parties, they are to be enforced for the benefit of the third: Graff *v.* Railroad Co., 7 Casey 498; Bavington *v.* Railroad Co., 10 Id. 362; Robinson *v.* Railroad Co., 8 Id. 339.

Mr. Justice GORDON delivered the opinion of the court, May 27th 1878.

By the paper, which we have before us, it appears that the stock to which the defendant subscribed, was designed for a special purpose; that is to say, for the "building and equipping of the extension of the Hanover Junction & Susquehanna Railroad, according

6 NORRIS—7

to the survey made by the Philadelphia & Reading Railroad Company."

When, therefore, the defendant signed this paper, he was thoroughly informed of the intended route of the proposed road, and of the fact that his subscription, with the others made and to be made, was to be appropriated to the building of the branch designated, and to no other purpose. Again, the contract contained the further stipulation, that the money, thus subscribed, should be paid only when the subscriptions reached the sum of $100,000. It also appears, from the paper itself, that these subscriptions were made by the "citizens of Marietta and its vicinity," which means, as we take it, by persons who were interested, not so much in the stock as an article marketable and valuable, as in the proposed improvement as something that would promote their individual welfare. We have, then, some ninety-nine or one hundred persons, of the indicated vicinage, agreeing together, under certain conditions, proposed to them by the railroad company, to join in the promotion of a common enterprise intended, mediately if not immediately, for their mutual benefit, and, in effect, one says to another : for this purpose, here plainly set out in writing, I will give so much if you will give so much more, and so on until the requisite amount is made up.

Under these circumstances, on the trial of this case, the defendant offered to prove that the subscription-book was brought to him by three persons, who, as it appears from his evidence, were officers of the company, and who induced him to subscribe by representing that the road should be built, not as stated in that book, but past the defendant's house and up the east side of the river, and, further, that he would not be obliged to pay until the road was so built. The court below overruled this offer; and what we have now to consider is whether this ruling was right or wrong. Were we to view the matter from the stand-point of the company's interest alone, we might pronounce against the conclusion adopted by the court. For that this company was in a position to make a binding conditional contract is conclusively settled by the case of this same company against Haldeman, 1 Norris 36. So, that a corporation must consent to abide by the contracts of its agents if it would profit by them, is in like manner ruled in Caley *v.* The Railroad Co., 30 P. F. Smith 363. So, it matters not whether the condition were in writing or parol, or if parol, that it contradicted the writing, if, but for such condition, the defendant would not have subscribed. So late as the case of Lippincott *v.* Whitman, 2 Norris 244, this court held (per Paxson, J.), that wherever equity would reform or set aside a written instrument, on the ground of fraud, accident or mistake, parol evidence is admissible to contradict or deny the terms thereof. Now, as this doctrine has been iterated and reiterated, in every variety of phrase, and in almost every volume of our reports

[Miller *v.* Hanover Junc. & Sus. Railroad Co.]

from 1 Binney to the present time, it may be taken as tolerably well settled. The reason of this rule is found in the desire of our courts to reach justice, however much the way thereto may be obstructed by mere technicalities. If one exhibits a written contract with his neighbor and it turns out, for any reason, that it does not contain the terms of the agreement, but rather the contrary, and if, through the interposition of some arbitrary rule, the truth of the matter cannot be shown, it is clear that injustice has been done, a result not tolerable in a well-arranged judicial system.

But, while this is so, we must take heed that the rule is not used as a means of fraud or wrongdoing. If, however, we permit the defendant to make that use of this rule which he desires, the deprecated result must follow. Had he expressed in writing, on the subscription-book, the condition proposed to be proved, it would have been fair notice, to his fellow-subscribers, that his subscription amounted to nothing; was, in fact, a mere sham, since the condition, opposed, as it was, not only to the expressed action of the company but to the condition involved in every other subscription, could not possibly be enforced. Now, as we have already shown, this subscription was specially designed to carry out a common adventure, in which the company was but a means used for its accomplishment, and the interests of which were but secondary; hence it follows, that if Miller succeeded in avoiding his obligation, he does so at the expense of his co-subscribers and in fraud of their rights. Every one who signed after him did so on the faith of his signature, as he did upon the faith of the signatures of those who preceded him, and to permit him now to set up a secret parol arrangement, by which he may be released whilst his fellows continue to be bound, would be anything but just. As was said in the case of Graff *v.* The Railroad Co., 7 Casey 489 (per Woodward, J.), "a subscription to a joint stock is not only an undertaking to the company, but with all other subscribers. Such contracts are trilateral, and even if fraudulent as between two of the parties, they are to be enforced for the benefit of the third." This quotation expresses a principle applicable to the case in hand, and aptly illustrates the reason why the defendant should be estopped from setting up the secret parol agreement between himself and the agents of the company.

Judgment affirmed.